_____ ENTERED
_____ FILED
_____ LODGED _____ RECEIVED

MAR 2 1 2016

AT GREENBELT
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **ALDMYR SYSTEMS, INC., et al.** | * | |
| | * | |
| Plaintiffs | * | |
| | * | |
| v. | * | Civil No. **PJM 15-864** |
| | * | |
| **STEPHEN A. FRIEDMAN, et al.** | * | |
| | * | |
| Defendants | * | |
| | * | |

### MEMORANDUM OPINION

This case, ostensibly seeking damages for copyright infringement under federal law and misappropriation of trade secrets under state law, is in reality an effort to wage a state-based domestic relations battle in federal court. The decision to dismiss the case, given that the case should never have been pursued outside the domestic litigation in state court, is easily made.

The more challenging question is the extent to which the filing of this suit in federal court should trigger sanctions under Federal Rule of Civil Procedure 11 against the corporate Plaintiffs, Plaintiffs' de facto controlling shareholder and CEO, and Plaintiffs' counsel.

### I.

The background facts are these:

### A.

Donald Bailey, Sr. ("Mr. Bailey") and Geraldine Bailey ("Mrs. Bailey") married in October 1999. Compl. ¶ 16, ECF No. 1. By 2014, the Baileys were involved in a

divorce proceeding in the Circuit Court for Anne Arundel County, Maryland. According to the docket sheet in the state case, *Geraldine M. Bailey v. Donald M. Bailey Sr.*, Circuit Court for Anne Arundel County, Case No. 02-C-14-186729, Mrs. Bailey sued Mr. Bailey for divorce on April 7, 2014. *See* State Ct. Docket, ECF No. 30-1.[1] The Complaint in the present federal case states that Mr. Bailey left the marital home "by agreement and not wishing to displace his family."[2] Compl. ¶ 21. Mrs. Bailey retained as her counsel in the divorce proceeding Stephen A. Friedman, Esquire, of the Greenbelt, Maryland law firm Joseph, Greenwald & Laake, P.A. ("JGL"). Mr. Friedman and his firm are both Defendants in the present proceeding.

In the state court proceeding, on September 16, 2014, Mrs. Bailey, through Mr. Friedman, served Mr. Bailey with a First Request for Production of Documents and a First Set of Interrogatories. *See* State Ct. Docket, ECF No. 30-1; Pl.'s Opp'n Def.'s Mot. Protective Order & Quash Subpoena ("Pl.'s Opp'n Mot. Protect. Order"), Ex. A, B, C, ECF No. 17-6. Since Mrs. Bailey's prayer for relief in the proceeding sought, among other things, a share of marital assets, her discovery request sought basic financial information pertaining to Mr. Bailey's business affairs, including his ownership and controlling interest in the corporate Plaintiffs in the present suit, Aldmyr Systems, Inc.

---

[1] A court may take judicial notice of docket entries, pleadings, and papers in other cases without converting a motion to dismiss into a motion for summary judgment. *See Papasan v. Allain*, 478 U.S. 265, 268 n.1, 106 S. Ct. 2932, 92 L.Ed.2d 209 (1986); *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004); *Bey v. Shapiro Brown & Alt, LLP*, 997 F. Supp. 2d 310, 316 n.4 (D. Md. 2014) *aff'd*, 584 F. App'x 135 (4th Cir. 2014) (taking judicial notice of state court docket entries). For ease of reference, the ECF numbers of the docket in this case are used to refer to documents filed in *Geraldine M. Bailey v. Donald M. Bailey Sr.* in the Circuit Court for Anne Arundel County.

[2] Plaintiffs' later filings state that Mr. Bailey was "forced to leave home by [a] court order enforced by police." Pls.' Resp. Opp'n Mot. Sanctions at 7, ECF No. 31; *see* Pls.' Resp. Opp'n Suppl. Mot. Sanctions at 6, ECF No. 35.

("Aldmyr") and Zegato Solutions, Inc. ("Zegato, Inc."). *See* Pl.'s Opp'n Mot. Protect. Order, Ex. A, B, C, ECF No. 17-6.

Discovery in the state divorce case and proceedings in the present federal suit establishes that Mr. Bailey indeed had an intimate relationship with Aldmyr and Zegato, Inc. He incorporated Aldmyr in 1989. Compl. ¶ 17. Although Aldmyr purportedly authored a computer program entitled "Per Diemmazing Travel Management System," according to the Complaint in the present action, it appears that Mr. Bailey actually authored the program because he registered a copyright for it in his own name in 1995. Compl., Ex. 2, ECF No. 1-2. Aldmyr also purportedly authored an improved and renamed version of Per Diemmazing Travel Management System, Compl. ¶ 19, but again, on September 30, 1999, Mr. Bailey claimed and registered a copyright for this version in his own name, this time for a computer program titled either "Zegato" or "Zegato Travel Management System." Compl., Ex. 3 at 1, ECF No. 1-3.

According to pleadings Mr. Bailey filed in the divorce proceeding and attached to Plaintiffs' surreply in the present federal case[3] (discussed further below), Mr. Bailey owned a 90% interest in Aldmyr, one of the Plaintiffs in this action. *See* Def.'s Opp'n Pl.'s Mot. Adjudicate Def. Contempt of Court at 4, ECF No. 11-31. In 2000, Zegato, Inc., the second Plaintiff in this action, was incorporated. Compl. ¶ 20. Again, in the state divorce proceeding, Mr. Bailey represented in pleadings that he had a 50% ownership interest in Zegato, Inc.[4] *See* Def.'s Opp'n Pl.'s Mot. Adjudicate Def.

---

[3] As the Court will explain, although styled as a brief in support of Plaintiffs' Motion for Summary Judgment, ECF No. 11, this pleading was in effect an unauthorized surreply to Defendants' Motion to Dismiss.

[4] The record is not clear as to the other 50% ownership interest in Plaintiff Zegato, Inc. But Mr. Bailey also represented in sworn testimony in the divorce proceeding that he had a 100% interest in Zegato, Inc. *See* State Ct. Hr'g Tr. 142:23–144:25, Dec. 18, 2014, ECF No. 13-1. While

Contempt of Court at 4.  Later on, Mr. Bailey stated in the same filing in the divorce proceeding, that, after Zegato Travel Solutions, LLC ("Zegato LLC") was incorporated, he held a 100% ownership interest in this entity.[5]  *Id.*  But then, in sworn testimony in the state divorce proceeding, under questioning from his own attorney, Mr. Bailey stated that he was the CEO and held a 100% ownership interest in all three of the corporate entities.  *See* State Ct. Hr'g Tr. 140:16–25, 142:23–144:25, Dec. 18, 2014, ECF No. 13-1.[6]

According to two documents attached to Plaintiffs' surreply in the present case, on July 5, 2005, Mr. Bailey assigned the right to reproduce and make derivative works of the copyrighted "Zegato Automated Travel System" to Aldmyr, *see* Pls.' Mot. Summ. J., Ex. Aldmyr Copyright Assignment, ECF No. 11-24, and the right to distribute and license the copyrighted "Zegato Automated Travel System" to Zegato, Inc.  *See* Pls.' Mot. Summ. J., Ex. Zegato, Inc. Copyright Assignment, ECF No. 11-25.[7]

---

Plaintiffs in the present suit have asserted that Mr. Bailey's brother, Lamont Bailey, owns a 10% interest in Aldmyr, *see* Pls.' Resp. Opp'n Mot Sanctions, Ex. 2, Lamont Bailey Aff. ¶¶ 1–2, ECF No. 24-3, they have not attempted to show what entity or individual owns the remaining 50% of Zegato, Inc.  It may well be that Donald Bailey, through another corporate entity, owns the other 50%.

[5] Mr. Bailey also has ownership interests in two other related companies.  According to pleadings in the divorce proceedings he holds a 100% ownership interest in Zegato Financial Solutions LLC ("Zegato Financial"), and a 10% interest in The Succor Group, LLC ("Succor Group"), which is "a Zegato Solutions sub-contractor."  Def.'s Opp'n Pl.'s Mot. Adjudicate Def. Contempt of Court at 4, ECF No. 11-31.  However, Mr. Bailey testified in the divorce proceedings that he currently owns 100% of the Succor Group, "indirectly" on behalf of his minor children.  State Ct. Hr'g Tr. 141:1–24, Dec. 18, 2014, ECF No. 13-1.  Mr. Bailey also testified that he "controls" the Succor Group and is the president or CEO of that entity.  *Id.*

[6] At oral argument in the case at hand, James P. Chandler, Esquire, counsel for Plaintiffs Aldmyr and Zegato, Inc., argued that Mr. Bailey had actually misstated the extent of his ownership interests in the state court testimony.  Mr. Chandler conceded, however, that Mr. Bailey in fact did exert 100% *control* over all three entities, and that based on his 100% control, Mr. Bailey had in fact authorized the filing of the instant federal lawsuit.  *See* Mot. Dismiss Hr'g Tr. 7:14–25, Aug. 3, 2015, ECF No. 20.

[7] The documents contain a signature line for Donald Bailey and a signature line for the company.  Both signature lines are signed by what appears to be an identical signature, and each signature appears to be that of Donald Bailey.  Neither document contains the signature of a witness or notary.

Although the Complaint in the present case contains few facts as to the precise nature of the Zegato software program, the Complaint describes it as "an elite travel system for the federal government," Compl. ¶ 20, that is "used in Fed Traveler," *id.* ¶ 12, presumably a different software system used by the federal government. According to a putative 2006 Software License Agreement that Plaintiffs attached to their Response in Opposition to the Motion to Dismiss, Zegato, Inc. licensed the Zegato Travel System source code to Electronic Data Systems which, in turn, had a contract with the General Services Administration of the federal government to deliver software for its eTravel program. Pls.' Resp. Opp'n Mot. Dismiss, Ex. 1, ECF No. 8-1. Finally, the Complaint in the present case alleges that Plaintiffs' software programs "processed the travel information of the U.S. Marshal Service and other secret federal agencies on a classified basis . . . ."[8] Compl. ¶ 33. According to Mr. Bailey's testimony in the divorce proceedings, the companies' contract with the federal government, which accounted for about 85 to 90% of their revenue, officially ended on December 15, 2014. *See* State Ct. Hr'g Tr. 114:5–115:23, Dec. 18, 2014, ECF No. 13-1.

Unquestionably, Mrs. Bailey and her counsel, Mr. Friedman, were entitled to fully explore Mr. Bailey's relationship with Aldmyr and Zegato, Inc. in the state divorce proceedings. The state court record is clear, however, that Mr. Bailey, through his counsel in the divorce proceedings, Greg Nugent, Esquire, stonewalled any production. On October 27, 2015, for example, Mr. Bailey through Mr. Nugent filed Objections and Responses to Mrs. Bailey's first discovery requests, in which he refused to answer many of Mrs. Bailey's interrogatories or produce documents on the grounds that disclosure

---

[8] The Complaint does not specify whether the Zegato program or some other program performs this function.

could threaten trade secrets and national security. *See* Pl.'s Opp'n Mot. Protect. Order, Ex. E, Def.'s Answers to Pl.'s Interrogs. Nos. 4–5, 7–9, ECF No. 17-6; Ex. D, Def.'s Resp. Pl.'s Request Produc. Docs. Nos. 1-8, 13–15, 17, 20, 28, 43–44, 46–47, 58, 60, 64, ECF No. 17-6. This refusal included a refusal to produce documents pertaining to business entities in which Mr. Bailey held an interest, namely, Aldmyr, Zegato, Inc., and Zegato LLC, or to supply basic financial information with respect to any business entity in which Mr. Bailey held an interest. *See* Pl.'s Opp'n Mot. Protect. Order, Ex. D, Def.'s Resp. Pl.'s Request Produc. Docs. Nos. 1–8, 13–15, 17, 20, 28, 43–44, 46–47, 58, 60, ECF No. 17-6. The refusal, it may be noted, even extended to requests for documents pertaining to real property in which Mr. Bailey held an interest, as well as other requests. *See id.*

At the same time, Mr. Bailey, who as noted, had departed the marital home either voluntarily or forcibly,[9] Compl. ¶ 21, stated that he could not produce many of the documents Mrs. Bailey requested because they were located in the marital home where Mrs. Bailey was then residing. *See* Pl.'s Opp'n Def.'s Mot. Protective Order, Ex. D, Def.'s Resp. Pl.'s Request Produc. Docs. Nos. 2–8, 10, 13–14, 16, 18, 25, 28, 43–44, 46–47, 51-52, 54, 56, 58, 63–64, ECF No. 17-6.

Thereafter, the plot began to thicken.

---

[9] According to the Complaint in the present case, the marital home, located in Gambrills, Maryland, is property owned by a corporation (2349 Patuxent River Road, Inc.) created by Donald Bailey and Aldmyr. Compl. ¶ 18. In a confusing passage from one of Mr. Bailey's filings in the divorce proceeding, he states that he holds a 100% ownership interest in the Patuxent River Road corporation, and that Aldmyr also "owns" the Patuxent River Road corporation. Yet in the same passage, Mr. Bailey states that he has a 90% ownership interest in Aldmyr. *See* Def.'s Opp'n Pl.'s Mot. Adjudicate Def. Contempt of Court at 3–4, ECF No. 11-31. Accordingly, it appears that either Mr. Bailey or one of his closely held corporations, or both, own the corporation that purportedly owns the marital home.

According to the Complaint in the present case, on October 30, 2014, three days after Mr. Bailey and Mr. Nugent had refused to produce the documents, Mr. Friedman and JGL ("the JGL Defendants") came into possession of some 813 pages of Aldmyr's business records and "related documents containing protected copyright information and a number of protected trade secrets," Compl. ¶ 12, including "valuations of Aldmyr/Zegato technology, valuations of Aldmyr/Zegato companies, a list of Aldmyr/Zegato customers, [and] the selling price or pricing of Aldmyr/Zegato technology. . . ." *Id.* ¶ 21. Although the Complaint in the present federal case as opposed to First Federal Case, discussed *infra*, fails to allege exactly how Mr. Friedman and JGL acquired the documents, it is clear from Plaintiffs' filings that they contend that Mrs. Bailey found the documents in Mr. Bailey's office within the marital home, then turned them over to her lawyers, the JGL Defendants. *See id.* ¶¶ 21–22.

According to the Complaint, the JGL Defendants then "translat[ed] . . . the Plaintiffs' copyrighted computer program and other intellectual property . . . to machine readable code, machine language, then cop[ied] by uploading the program to [the JGL Defendants'] computer and to [the JGL Defendants'] computer server." [10] *Id.* ¶ 13. In other words, Plaintiffs allege that Mr. Friedman scanned the paper documents Mrs. Bailey had collected to a JGL computer connected to their server. Mr. Friedman then allegedly made another copy of the copyrighted computer program and other intellectual property "by transferring the IP to his computer hard drive . . . [and] by downloading the electronic copy . . . onto an electronic magnetic disk or disks . . . ." *Id.* The JGL Defendants then allegedly "disclosed this IP and all trade secret information to others by

---

[10] In their Opposition to the Motion to Dismiss, Plaintiffs state that "defendants copied about 50 pages or more of forbidden computer code." Pls.' Resp. Opp'n Defs.' Mot. Dismiss at 5, ECF No. 8.

delivering the . . . copies of the IP disks . . . to others both inside and outside defendants' firm including members of the firm." *Id.* Specifically, according to Plaintiffs, the JGL Defendants disseminated the intellectual property to their staff, their third party technology experts, even to Mr. Nugent—counsel for Mr. Bailey in the divorce proceedings—and "perhaps others." *Id.* ¶ 22.

Further, according to the Complaint, the JGL Defendants copied and disseminated the copyrighted computer program and other intellectual property "for their use in domestic litigation in an effort to force the Plain[t]iffs, owners of the copyrighted works, to pay a large sum of money, 1.5 million dollars, for release and return of the IP information in settlement of the litigation with one of plaintiffs stock holders . . . ." *Id.* ¶ 13. More specifically, Plaintiffs allege that "Stephen Friedman and defendants have used his possession of Plaintiff's IP and other proprietary information, including trade secrets and copyrighted computer technology, as a bargaining chip in the negotiations with Donald Bailey's marriage counsel . . . . [H]e and his firm [have] threatened to transfer the IP including these copyrighted works and trade secrets to persons outside his firm's possession, for example, to other individuals who contract with his firm and permanently retain the IP, copyrighted technology and trade secrets for future use . . . ." *Id.* ¶ 23.

In the present case, the JGL Defendants have filed as an exhibit the October 31, 2014 letter Mr. Friedman sent to Mr. Nugent, Mr. Bailey's counsel, that accompanied the compact disc containing the documents Mrs. Bailey had apparently collected in the marital home. *See* Defs.' Suppl. Mot. Sanctions, Ex. 2 at 1, ECF No. 34-2. Mr. Friedman's letter explained that, in response to Mr. Bailey's discovery responses that he could not produce certain documents in the marital home, "Ms. Bailey has provided me

with a copy of all of the documents that she located within the marital home and that she believes are Mr. Bailey's personal and business documentation. A copy of these documents are contained on the attached CD and marked with Bates No. 1 to 823." *Id.*[11]

The Complaint further alleges that Mr. Chandler, counsel to Aldmyr/Zegato, Inc., Plaintiffs in the present action, advised Mr. Nugent, Mr. Bailey's counsel in the divorce proceedings, to seek a court order to "protect the intellectual property from disclosure." Compl. ¶ 23.

And in fact, according to the docket in the divorce action, on October 30, 2014, Mr. Bailey, acting through Mr. Nugent, filed in that proceeding a Motion for a Protective Order and to Quash Subpoena Duces Tecum to Protect Trade Secrets. *See* State Ct. Docket, ECF No. 30-1. The Motion pertained primarily to a subpoena that Mr. Friedman had issued to the Custodian of Records for Harbor Bank of Maryland, in which he sought to obtain records and depose the Custodian about Mr. Bailey's personal and business accounts at the institution. In moving to quash the subpoena in state court, Mr. Bailey once again represented that the requested records contained trade secrets and sensitive information the disclosure of which could endanger national security. *See* Def.'s Mot. Protect. Order & Quash Subpoena ¶¶ 2–3, ECF No. 17-5. To the extent that production became necessary, Mr. Bailey proposed that a Protective Order applicable to trade secrets, proprietary and privileged information, and financial information be issued. *See id.* ¶ 5.

Mrs. Bailey, acting through Mr. Friedman and JGL, vigorously opposed Mr. Bailey's Motion for a Protective Order and to Quash Subpoena. With respect to the

---

[11] JGL Defendants do not dispute that Mrs. Bailey took the documents from the marital home and turned them over to her attorneys.

subpoena, she argued, Mr. Bailey to that point had flatly refused to provide even the most basic financial information about his assets in response to her attorney's discovery requests, citing as his grounds that disclosure could threaten trade secrets and national security. *See* Pl.'s Opp'n Def.'s Mot. Protect. Order at 2, ECF No. 17-6. Mrs. Bailey also pointed out that Mr. Bailey had provided social security statements showing that his income was $0.00 in 2012 and $2,616 in 2013, whereas he had elsewhere reported net family expenses of $95,000 per year and had, to that point, paid $22,000 in fees to his divorce counsel. *Id.* at 2–3. Mrs. Bailey sought to subpoena Mr. Bailey's records from his bank so that she might obtain evidence of his true income and true assets for purposes of the divorce proceedings.[12] *Id.* at 4–5. Mrs. Bailey further represented that, through the JGL Defendants, she had offered to execute a reasonable confidentiality order with Mr. Nugent and Mr. Bailey in order to protect purported trade secrets and other supposedly confidential information, and suggested that Mr. Bailey's proposed protective order might still form the basis for a negotiated order in the future. *Id.* at 5–6.

On November 21, 2014, Anne Arundel County Circuit Court Judge Alison Asti issued an order stating that upon "consideration of Defendant's Motion for Protective Order and to Quash Subpoena Duces Tecum . . . Defendant's Motion to Quash Subpoena Duces Tecum is DENIED." State Ct. Order Denying Def.'s Mot., ECF No. 17-7. The order did not set forth its rationale. *Id.* For the first time, several months later at oral

---

[12] In the course of the divorce proceedings, it became apparent that Mr. Bailey's corporations had not prepared or filed State or Federal tax returns for some time, and, at a minimum, had failed to do so from 2009 to 2014. Mr. Bailey's Opposition to Mrs. Bailey's Second Motion to Compel Discovery stated that Mr. Bailey had engaged a certified public accountant for the "laborious task of reviewing corporate and personal records to create State and Federal tax returns," but that "filed tax returns that do not yet exist must be created" before they can be produced. Def.'s Suppl. Resp. Pl.'s Req. Produc. Docs., No. 2, ECF No. 34-13; Def.'s Opp'n Pl.'s 2d Mot. Compel Disc. ¶¶ 3–4, ECF No. 34-14.

argument in the present case, Mr. Chandler, counsel for Plaintiffs, took the position that Judge Asti's order had only denied Mr. Bailey's Motion to Quash the Subpoena; it had not adjudicated the Motion for Protective Order. *See* Mot. Dismiss Hr'g Tr. 13:8–14:18, Aug. 3, 2015, ECF No. 20. Whether or not that was or is a tenable position, it is undisputed that at no time did Mr. Bailey, Mr. Nugent, or Mr. Chandler ever go back to Judge Asti to seek clarification of her order. The JGL Defendants, it may be noted, have taken the position that Judge Asti denied Mr. Bailey's Motion in its entirety, including his request for a protective order. *See* Mot. Sanctions Hr'g Tr. 23:6–18, Jan. 5, 2016, ECF No. 38.

While Mr. Bailey, through Mr. Nugent, did not file for another protective order in the divorce proceedings, *see* State Ct. Docket, ECF No. 30-1, the record in the divorce proceeding indicates that the parties continued to negotiate a potential protective order on and off for the next several months.[13]

Although somewhat out of sequence chronologically speaking, it bears noting that on November 11, 2014, Mrs. Bailey, through Mr. Friedman, had filed a Motion to Compel Discovery, in which she sought a court order compelling Mr. Bailey to supply

---

[13] The JGL Defendants have filed an exchange of letters between Mr. Friedman and Mr. Nugent as an exhibit to their Supplemental to Motion for Sanctions. *See* Defs.' Suppl. Mot. Sanctions, Ex. 19, 20, 21, ECF Nos. 34-19, 34-20, 34-21. According to an email Mr. Friedman sent to Mr. Nugent on November 14, 2014, Mr. Friedman sent a revised copy of a proposed protective order that Mrs. Bailey was willing to sign. Defs.' Suppl. Mot. Sanctions, Ex. 21 at 2 ("Nov. 2014 Emails"), ECF No. 34-21. Mr. Nugent responded on November 17, 2014, stating, "I have passed along a copy to Aldmyr-Zegato's counsel to see if this suffices for them." *Id.* On November 23, 2014, Mr. Nugent sent an emailing stating, "I am not dragging my feet on this. The company's counsel lost one of his adult children suddenly about 10 days ago." *Id.* at 1. A second set of letters dated March 20, 2015 and March 22, 2015 also discusses counterproposals for a protective order. *See* Defs.' Suppl. Mot. Sanctions, Ex. 22, 23, ECF Nos. 34-22, 34-23. While the Court does not consider the letters for purposes of the Motion to Dismiss, they are clearly relevant for the purpose of Defendants' Motion for Sanctions, especially insofar as they evidence Attorney Chandler's knowledge of and behind the scenes participation in the state divorce proceedings.

the requested information which he was declining to produce. *See* Pl.'s Mot. Compel Disc., ECF No. 34-3; State Ct. Docket, ECF No. 30-1.

On December 1, 2014, Mr. Bailey, through his counsel Mr. Nugent, filed an opposition to the Motion to Compel, yet again asserting that the materials were protected trade secrets and that they affected national security interests. *See* Def.'s Resp. Pl.'s Mot. Compel, ECF No. 34-4. Among other arguments, Mr. Bailey's opposition stated that as an alternative solution to an Order to Compel, "[a] protective order that satisfies Zegato Solutions and their counsel represents a start. From there, Defendant can produce business-related documents without fear of compromising his security clearance and that of the company." *Id.* ¶ 7.

From all this, there could be no mistaking that everyone—most pointedly Mr. Bailey, Mr. Nugent, and Mr. Chandler—understood that the proper venue to hash out access to and use of Mr. Bailey's supposedly secret data was in the state court, and that that should be done before the same Judge Asti who had handled Mr. Bailey's earlier request for a protective order.

### B.

But then began a series of actions by Mr. Bailey and Mr. Chandler that were intended to work to the extreme prejudice of Mrs. Bailey and the JGL Defendants.

On December 10, 2014, ten days after Mr. Nugent suggested to the state judge that a satisfactory protective order with respect to the purportedly secretive materials might be worked out, Zegato LLC, acting through its counsel, Mr. Chandler, with the authorization and approval of Mr. Bailey, filed a Complaint in Federal Court against Mrs. Bailey and the JGL Defendants, *see* Compl., *Zegato Travel Solutions, LLC v. Geraldine*

*M. Bailey et al.*, Civ. No. 14-3808 (D. Md. 2014) (the "First Federal Case"). This case, as it turned out, was so obviously deficient that the Judge assigned to the case, the Honorable Theodore Chuang, dismissed it out of hand, without permitting it to be served on Defendants.

The Complaint in the First Federal Case largely tracks the factual allegations in the Complaint in this, the Second Federal Case, but notably adds more: it specifically alleges that Mrs. Bailey, who was named as a Defendant in the First Federal Case, "raided [Donald Bailey's] home office" and "stole 813 pages of confidential material and stole Donald[ Bailey's] private possessions . . . and delivered them to her attorney, Steve Friedman Esq." First Federal Case, Compl. at 5, ECF No. 1.[14] The Complaint in the First Federal Case went on to allege that the defendants' conduct violated 18 U.S.C. § 1832, which criminalizes the misappropriation of trade secrets, as well as Section 11-1201 of the Maryland Uniform Trade Secrets Act. *Id.* at 6–7. Zegato LLC also moved for an *ex parte* temporary restraining order and a preliminary injunction. First Federal Case, Pl.'s Mot. T.R.O., ECF No. 2.

Judge Chuang did not wait for the defendants to answer this First Federal Case, but instead immediately issued a *sua sponte* order to Zegato LLC to show cause why the action should not be dismissed for lack of subject matter jurisdiction. First Federal Case,

---

[14] The Complaint in the First Federal Case also alleges that "People knew Zegato better than Aldmyr, therefore later Zegato was incorporated and eventually became ZEGATO TRAVEL SOLUTIONS, LLC. HOLDER OF ALL INTELLECTUAL PROPERTY BY ASSIGNMENT FROM ALL ENTITIES." First Federal Case, Compl. at 4 (capitalization in original). This oddly structured and formatted sentence, read in context, appears to allege that Zegato LLC holds the intellectual property rights, presumably including copyrights, for the Zegato Travel System computer code. Such an allegation contradicts the allegations in the instant case that Aldmyr and Zegato, Inc. are the owners of the copyrights for the Zegato Travel System computer code. It also raises questions about the adequacy of Mr. Chandler's pre-filing investigation in both the First and Second Federal Cases.

Show Cause Order, ECF No. 4. The next week, Zegato LLC responded by filing an Amended Complaint. First Federal Case, Amend. Compl., ECF No. 6. But on December 22, Judge Chuang issued a Memorandum Order dismissing the First Federal Case for lack of subject matter jurisdiction. First Federal Case, Memo. Order, ECF No. 8.

In his Memorandum Order of Dismissal, Judge Chuang pointed out that Zegato LLC had alleged federal question jurisdiction by asserting a claim under 18 U.S.C. § 1832. Title 18 is the Crimes and Criminal Procedure Title of the United States Code, but, as he pointed out, the statute does not create a right for private citizens to institute a criminal prosecution or enforce criminal statutes. *See id.* at 3. Accordingly, any claim made pursuant to 18 U.S.C. § 1832 was not a proper cause of action and could not be the basis for federal jurisdiction. As for diversity jurisdiction, Judge Chuang observed that Zegato LLC's Amended Complaint had also pleaded that diversity of jurisdiction existed because Zegato LLC was incorporated in the District of Columbia, whereas Mrs. Bailey and the JGL Defendants were citizens of Maryland. But Judge Chuang pointed out that Zegato LLC was a limited liability company, not a corporation, and that for purposes of diversity jurisdiction, the citizenship of a limited liability company is determined by the citizenship of all its members. *See id.* at 2. Since the Amended Complaint in the First Federal Case stated that "[a]ll the interests of Zegato are owned by Donald Bailey . . . . a citizen of the state of Maryland," First Federal Case, Amend. Compl. ¶ 1, Judge Chuang held that Zegato LLC was a citizen of Maryland, so that the parties were not diverse, and that the court also lacked subject matter jurisdiction over the misappropriation claim on that basis. *See* First Federal Case, Memo. Order at 2–3. Judge Chuang also took the occasion to note that while Zegato LLC, in its initial Complaint, had pleaded that its

principal place of business was an address in Lanham, Maryland, in the Amended Complaint, without the least explanation, Zegato LLC suddenly altered this fact, alleging instead that its principal place of business was in Washington, D.C. *See id.* at 3 n.1. Yet, as Judge Chuang further noted, contrary to this attempted change of address in the body of the pleadings, the caption of Zegato LLC's Amended Complaint and Zegato LLC's own motion continued to indicate that Zegato LLC was headquartered at the Lanham, Maryland address. *See id.* So much for the quality of the pleading in the First Federal Case.

On April 3, 2015, approximately four months after dismissal of the First Federal Case, Mr. Chandler, on behalf of Aldmyr and Zegato, Inc., filed the Complaint in the present case. Compl., ECF No. 1, ("Second Federal Case" or "present case").

During the period between the two Federal cases, and after the present case was filed, the parties to the divorce proceedings continued the discovery dispute, still unable to reach agreement as to a protective order.[15]

Back in state court, on May 4 and 5, 2015, a show cause hearing was held before Judge Asti regarding Mr. Bailey's failure to comply with the court's February 5, 2015 *pendente lite* order that he pay Mrs. Bailey alimony and legal fees. *See* State Ct. Hr'g Tr. 3:18–5:16, May 5, 2015, ECF No. 34-8. As it happens, the parties were able to reach an

---

[15] According to an exchange of letters between Mr. Friedman and Mr. Nugent, filed by the JGL Defendants as an exhibit to their Supplemental Motion for Sanctions, in late March 2015, Mr. Nugent and Mr. Friedman resumed the negotiations over a protective order. Defs.' Suppl. Mot. Sanctions, Ex. 22, 23, ECF Nos. 34-22, 34-23. On March 20, 2015, Mr. Nugent emailed Mr. Friedman a new draft of the protective order stating, "[w]ith all this said, I cannot speak for the company and will not weigh in on the company's objections. If you are not able to accept this version, I have to direct you to The Chandler Law Firm for further discussions." Defs.' Suppl. Mot. Sanctions, Ex. 23 at 3, ("March 2015 Emails"), ECF No. 34-23. Mr. Friedman's letter response explained his objections to Mr. Nugent's draft, noting that "[i]t took 4 months to get a response to my proposed Protective Order[.]" *Id.* at 1.

agreement as to implementation of the *pendente lite* order.  But Judge Asti also granted Mrs. Bailey's Motion to Compel, ordering Mr. Bailey to cure deficiencies in his responses to Plaintiff's First Set of Interrogatories and produce the documents Mr. Bailey and Mr. Nugent were attempting to withhold. *See* State Ct. Disc. Order, ECF No. 34-9.

At the May 5, 2015 state court hearing, the parties continued to debate the terms of a possible protective order.  Mr. Nugent explained that while there were attempts to work out a protective order to at least get the parties through discovery, Mr. Friedman's counterproposals were not acceptable to Mr. Bailey's *companies*. *See* State Ct. Hr'g Tr. 35:16–36:13, May 5, 2015.  At that point, according to Mr. Nugent, he was "trying to get the company and counsel for Mrs. Bailey to talk about coming up with a protective order," *id.* 39:21–22, and that he was "just serving as a referee role." *Id.* 39:23.

At the state court hearing, the parties also disputed whether the temporary seal should be lifted on the transcript to a December 18, 2014 hearing, at which Mr. Bailey had testified to his ownership and control over the corporate Plaintiffs. *See* State Ct. Hr'g Tr. 140:16–25, 142:23–144:25, Dec. 18, 2014, ECF No. 13-1.  Mr. Nugent asserted that the companies' counsel[16] would need to address need for a permanent seal to protect trade secrets and national security concerns. *See id.* 39:23–40:20.  Judge Asti continued the hearing until May 11, 2015, *id.* 42:5–15, but inexplicably neither Mr. Chandler nor any other counsel for the corporate Plaintiffs appeared at the hearing to speak in opposition. *See* Defs.' Suppl. Mot. Sanctions at 6, ECF No. 34; Mot. Dismiss Hr'g Tr. 16:20–17:9, Aug. 3, 2015, ECF No. 20; Mot. Sanctions Hr'g Tr. 73:5–20, Jan. 5, 2016, ECF No. 38.   Judge Asti thereupon granted Mrs. Bailey's Motion to Unseal the

---

[16] There can be no mistaking that Mr. Nugent was referring to Mr. Chandler.

transcripts from the December 18, 2014 hearing.  Civil Hr'g Sheet, May 11, 2015, ECF No. 34-11.

The parties' discovery dispute in the state court continued throughout June 2015. However, on June 30, 2015—given that they had been sued in the present Federal Case by Mr. Chandler, on behalf of Aldmyr, Zegato, Inc., and (as the Court will discuss *infra*) Mr. Bailey—the JGL Defendants filed a Motion to Withdraw Appearance from the state court proceeding, which the state court granted on July 20, 2015. *See* State Ct. Docket, ECF No. 30-1.  According to the docket in that case, no other counsel entered an appearance on behalf of Mrs. Bailey, and, on November 6, 2015, Mrs. Bailey, still listed as acting *pro se*, moved to dismiss the state court case.  *See id.*

## II.

Judge Chuang's Memorandum Order of Dismissal of the First Federal case issued on December 22, 2014. Approximately four months later, on April 3, 2015, the instant action was filed but was assigned to this member of the Court rather than Judge Chuang.[17]  And in the present case—the Second Federal Case—Mrs. Bailey has mysteriously disappeared as a defendant.  Only the JGL Defendants have been carried forward.  Plaintiffs in the instant action—Aldmyr and Zegato, Inc.—are supposedly distinct entities from Zegato LLC, the plaintiff in the First Federal Case.[18] Mr. Chandler, however, is the same attorney who represented Zegato LLC in the First Federal Case, and

---

[17] For some reason, although the Complaint in the present case was filed on April 2, 2015, Mr. Chandler indicated that service was made on February 23, 2015. Compl. at 15.

[18] The Court notes that Zegato LLC is not one of the two Plaintiffs in the present case, which are Aldmyr and Zegato, Inc. Geraldine Bailey's presence in the First Federal Case and her absence from the current suit strongly suggest that a conscious decision was made to try to distance the current litigation from the state divorce proceedings.

is also the one who filed the present suit, appearing as counsel for the two corporate Plaintiffs.[19]

The present Complaint posited two claims for relief against the JGL Defendants: (1) copyright infringement, in violation of 17 U.S.C. § 101 *et seq.*, and (2) misappropriation of trade secrets, in violation of Md. Code Ann., Com. Law § 11-1201. Plaintiffs asked for injunctive relief, statutory damages, attorneys' fees, and costs.

The JGL Defendants filed a Motion to Dismiss the Complaint, ECF No. 5, Plaintiffs responded, ECF No. 8, and the JGL Defendants replied, ECF No. 10. Then about a month after the JGL Defendants filed their reply, Plaintiffs filed what they styled as a "Motion for Partial Summary Judgment." ECF No. 11. The latter pleading by Plaintiffs, however, is nothing more than an unauthorized surreply. But even viewed as an independent Motion, the Motion, while reciting the standards for determining a motion for summary judgment, does not begin to explain why no genuine issue of material fact might exist as to Plaintiffs' copyright claim, such that Plaintiffs should be entitled to summary judgment. Indeed, the Motion simply responds one more time to arguments raised by the JGL Defendants in their Motion to Dismiss and in their reply to Plaintiffs' Opposition to that Motion. Since the Court construes Plaintiffs' Motion for Partial Summary Judgment for what it really is, an unauthorized repetitive surreply to the JGL Defendants' Motion to Dismiss, the Court will strike the Plaintiffs' Motion.[20]

---

[19] The Court observes that under the signature line of the Complaint, Mr. Chandler describes himself as the "Agent of Aldmyr Systems, Inc., Zegato and Zegato Travel Solutions, Inc." Compl. at 15. It is unclear what "Zegato's" interest may be in the present suit, or why Mr. Chandler would be acting as its agent by filing a lawsuit on behalf of two other separate legal entities.

[20] Plaintiffs filed two other unauthorized surreplies, both styled as a Response in Opposition to Motion for Sanctions, and both of which will also be stricken. *See* Pls.' Resp. Opp'n Mot. Sanctions, ECF No. 31; Pls.' Resp. Opp'n Mot. Sanctions, ECF No. 37.

On August 3, 2015, the Court held oral argument on the JGL Defendants' Motion to Dismiss, at the conclusion of which the Court held that the present suit did not belong in federal court, because it was essentially a ploy intended to end-run the pending state court divorce proceedings and to gain an unfair advantage there. *See* Mot. Dismiss Hr'g Tr. 21:6–19, Aug. 3, 2015, ECF No. 20. In particular, the Court noted its concern that the suit clearly implicated the strong possibility of sanctions under Federal Rule of Procedure 11. *Id.* 21:20–24. But while the Court indicated that it would be disposed to entertain a Motion for Sanctions by JGL Defendants, if they so chose, given that Defendants might prefer to conserve further time and expense in the matter, the Court indicated it would leave it up to Defendants to decide whether to file such a Motion. *See id.* 29:7–32:14.

On August 13, 2015, the JGL Defendants did in fact move for Rule 11 sanctions against Plaintiffs and Attorney Chandler. Attached as exhibits to their Motion were letters exchanged between counsel in June 2015. In one letter, Shirlie Lake, Esquire, counsel for the JGL Defendants, served Mr. Chandler with a copy of a proposed Motion for Sanctions, in which she indicated that she intended to file if the Complaint was not withdrawn in 21 days. Defs.' Mot. Sanctions, Ex. 1, ECF No. 17-1; *see* Fed. R. Civ. Pro. 11(c)(2). Mr. Chandler responded with a letter rejecting any suggestion that his suit violated Rule 11. *See* Defs.' Mot. Sanctions, Ex. 2, ECF No. 17-2.

In view of what the Court took to be an intimate nexus between the current litigation and the divorce proceedings, on August 14, 2015, the Court *sua sponte* issued a Memorandum Order directing Mr. Bailey to Show Cause why, along with corporate Plaintiffs and Mr. Chandler, he too should not be held liable for any sanctions imposed

against the Plaintiffs inasmuch as he, at all relevant times, may have been functioning as the alter ego of the two corporate Plaintiffs. Show Cause Order, ECF No. 18.

On January 5, 2016, the Court held a hearing on the Motion for Sanctions and the Show Cause Order, at which Mr. Chandler appeared, but Mr. Bailey did not. *See* Mot. Sanctions Hr'g Tr. 2:12–20, Jan. 5, 2016, ECF No. 38.

When the Court inquired of Mr. Chandler why Mr. Bailey had not appeared, Mr. Chandler responded that he did not represent Mr. Bailey; that Mr. Bailey was traveling; and that the Court could have subpoenaed Mr. Bailey if it had wanted to. *Id.* 2:12–3:10, 36:9–20. Apparently lost on Mr. Chandler was the fact that Mr. Bailey, as the possible 100% owner and unquestionably the controlling shareholder of the corporate Plaintiffs, might well be held liable for sanctions in the present case as the alter ego of the corporations and that the show cause hearing was scheduled to give Mr. Bailey an opportunity to indicate why he should not be held liable. Mr. Bailey could choose to be present or not—the Court did not need to subpoena him—but the Court was prepared to proceed without him if he chose to not appear. Mr. Bailey had his opportunity to be heard on the issue of his alter ego status, did not show cause, and the time has now passed for him to be heard.[21]

### III.

The Court deems the present action for alleged copyright infringement and theft of trade secrets as nothing more than a thinly veiled, too-clever-by-half effort to gain an unfair advantage in a state divorce proceeding. The entire issue of the actions of Geraldine Bailey, Mr. Friedman, and JGL vis-à-vis Mr. Bailey's documents could have

---

[21] Mr. Chandler's surprising curtness with the Court at the hearing is a separate matter that cannot pass unremarked.

been, should have been, and indeed, essentially had been, decided by Judge Asti in the state divorce proceedings. Were there any doubt as to the scope of her ruling—whether she meant to leave the Motion for Protective Order unresolved while denying the Motion to Quash Subpoena (this Court believes she did not intend to do so)—Judge Asti was the proper decider. The present suit, totally without justification, bypassed that single, direct route, and as a result, Mrs. Bailey was deprived of her counsel, inordinate delay resulted, Mr. Friedman and JGL lost an employment opportunity, and what is more important, suffered considerable expense and harassment, quite possibly as well injury to their professional reputations.

Domestic relations cases are traditionally matters within the exclusive purview of state, not federal, courts. What is known as the domestic relations exception "divests the federal courts of power to issue divorce, alimony, and child custody decrees." *Ankenbrandt v. Richards*, 504 U.S. 689, 703, 112 S. Ct. 2206, 2215, 119 L. Ed. 2d 468 (1992); *Mansell v. Mansell*, 490 U.S. 581, 587, 109 S. Ct. 2023, 2028, 104 L. Ed. 2d 675 (1989) ("[D]omestic relations are preeminently matters of state law . . . ."); *accord Cole v. Cole*, 633 F.2d 1083, 1087 (4th Cir. 1980); *see also McNeil v. Maryland*, No. DKC 11-2495, 2012 WL 3643899, at *7 (D. Md. Aug. 22, 2012), *aff'd*, 505 F. App'x 279 (4th Cir. 2013) (dismissing under *Rooker-Feldman* doctrine claims seeking review of adverse state court domestic relations decisions, or matters "inexplicably intertwined" with such decisions); *Al-Mansour v. Shraim*, No. CCB-11-2939, 2012 WL 983785, at *4 (D. Md. Mar. 21, 2012) (abstaining under *Younger* doctrine from plaintiff's request for a

declaratory judgment that she was not obligated to pay child support obligations, in light of ongoing state court child support suit).[22]

The rationale of the rule is clear. Domestic relations cases are within the purview of the states because intimate personal issues, often highly emotional in nature, characterize domestic relations proceedings, which are far better suited for local courts rather than federal courts to resolve. Accordingly, efforts to litigate what are essentially domestic relations cases in federal court are routinely dismissed. Even in cases in which domestic relations proceedings have occasioned federal copyright or intellectual property claims, federal courts have avoided interference with the pending state case. *See, e.g.*, *Moss v. Moss Tubes, Inc.*, No. 96 CV 1407, 1997 WL 727611, at *3 (N.D.N.Y. Aug. 21, 1997) ("[A] stay is appropriate in this instance. . . . Regardless of this Court's application of patent law, the state court's disposition of marital assets at issue will have a profound

---

[22] There are a few exceptions to the general rule. The Fourth Circuit has noted that "not all family feuds . . . fall directly into the specialized category of true domestic relations cases (primarily divorce, alimony, child custody and support). A district court may not simply avoid all diversity cases having intrafamily aspects. Rather it must consider the exact nature of the rights asserted or of the breaches alleged." *Cole*, 633 F.2d at 1088. The Fourth Circuit has also held that the jurisdictional exception is applied only as a judicially implied limitation on diversity jurisdiction; it has no generally recognized application as a limitation on federal question jurisdiction. *See United States v. Johnson*, 114 F.3d 476, 481 (4th Cir. 1997). In marked contrast, Courts of Appeal outside the Fourth Circuit are divided as to whether the doctrine is limited to diversity claims. *See, e.g.*, *Mandel v. Town of Orleans*, 326 F.3d 267, 271 (1st Cir. 2003) (noting that courts are divided but declining to decide the issue); *Thompson v. Thompson*, 798 F.2d 1547, 1558 (9th Cir. 1986), *aff'd*, 484 U.S. 174, 108 S. Ct. 513, 98 L. Ed. 2d 512 (1988); *see also Jones v. Brennan*, 465 F.3d 304, 307 (7th Cir. 2006) (Posner, J.) ("There is no good reason to strain to give a different meaning to the identical language in the diversity and federal-question statutes. The best contemporary reasons for keeping federal courts out of the business of . . . granting divorces and annulments, administering decedents' estates, [and] approving child adoptions . . . are as persuasive when a suit is filed in federal court on the basis of federal law as when it is based on state law."). In any case, the Fourth Circuit's language does not preclude rejection of a state-based domestic relations-related case that seeks to assert a federal question claim in federal court "where a wholly frivolous federal claim serves as a pretext to allow a state-law issue, the real focus of the claim, to be litigated in the federal system." *Lovern v. Edwards*, 190 F.3d 648, 655 (4th Cir. 1999).

impact here."); *Stein v. Soyer*, No. 97 CIV. 1317(MBM), 1997 WL 104967, at *1 (S.D.N.Y. Mar. 10, 1997).

It cannot be doubted that discovery related to the existence and nature of marital assets in a divorce proceeding is four-square a matter of state rather than federal court concern.

In the course of virtually every divorce proceeding, in Maryland or elsewhere, an assessment of the value of marital assets is necessary for purposes of determining the equitable distribution of property as between the spouses, and indeed for purposes of determining the amounts, if any, of alimony and child support to be paid. *See* Md. Code Ann., Fam. Law §§ 8-203, 8-204; *see, e.g.*, *Innerbichler v. Innerbichler*, 132 Md. App. 207, 752 A.2d 291 (Md. Ct. Spec. App. 2000) (reviewing corporate assets for equitable distribution); *Long v. Long*, 129 Md. App. 554, 568–73, 743 A.2d 281, 289–91 (Md. Ct. Spec. App. 2000) (conducting valuation of husband's companies). There is no question that, should one spouse attempt to shield or conceal his or her assets, any state divorce court would without question order appropriate responses to interrogatories or the production of relevant business documents for evaluation purposes, with—to be sure— appropriate confidentiality protections. In the context of divorce proceedings, state courts routinely consider trademarked, patented, and copyrighted material for the purposes of determining marital property. *See, e.g.*, *In re Marriage of Worth*, 195 Cal. App. 3d 768, 241 Cal. Rptr. 135 (Cal. Ct. App. 1987) (affirming that copyrights on husband's books were community property).

Merely reciting the facts of the present case exposes its sham nature. After Mr. Bailey and his state court counsel refused to provide them, Mrs. Bailey found documents

or materials purportedly containing a copyrighted source code and alleged trade secrets related to Mr. Bailey's business that he had left in the marital home. Mrs. Bailey then turned the materials over to her attorney, who copied them, and then made them available to an expert for valuation purposes in the divorce proceedings. As he pled in the First Federal Case, Mr. Chandler (who claims that the present suit is independent of the state court proceedings and that "[Mr. Bailey is] not my client," Mot. Sanctions Hr'g Tr. 2:20) alleged that Mrs. Bailey had stolen the materials, then gave them to her confederates who themselves went on to use them in an improper way. *See LeJeune v. Coin Acceptors, Inc.*, 381 Md. 288, 313, 849 A.2d 451, 466 (Md. 2004) ("[A] trade secret is acquired by 'improper means' when it has been acquired by 'theft, bribery, misrepresentation, breach or inducement of a breach of duty to maintain secrecy, or espionage through electronic or other means.'") (quoting Md. Code Ann. Com. Law § 11-1201(b)).

But to argue that a divorcing wife who gains access to her husband's business materials in order to have her attorney attempt to value them in a divorce proceeding is a "thief" and that her attorney is a "thief," subjecting them to criminal or civil liability as such, makes a mockery of what divorce proceedings are all about. Furtive access to an adversary spouse's "private" information left in the marital home happens all the time and has surely occurred from time out of mind, particularly with regard to the need to discover concealed marital assets. The fact that a wife may come across a husband's business (even allegedly "private") papers and materials in the marital home and either take possession of or copy them is hardly a basis for a claim of theft of trade secrets or copyright infringement. If that were so, every spouse—even those not actively engaged in divorce proceedings—who merely peeked at the other spouse's "private" papers might

end up being hauled into court for invasion of privacy or, if she went so far as to or copy the papers, might find herself defending a criminal as well as civil action. The fact that a wife might turn the materials she finds over to her attorney in the divorce proceeding, and that the attorney might send them to an asset valuation expert, is equally commonplace. The wife is entitled to know her husband's true worth, especially where she has good reason to believe he may be underreporting, concealing, or stonewalling the production of financial information. Every attorney who might look at or analyze information supplied by a wife who came into possession of any materials from her husband that the husband did not expressly authorize her to possess—purportedly top secret or not—would then be forced to fight a costly rear guard battle, just as the JGL Defendants have been required to do here, that has nothing at all to do with the merits of the divorce case, and, because of the conflict of interest the attorney would be placed in, would be forced to withdraw from the state court proceeding.

But there is more:

Had there been anything improper about the way Mrs. Bailey came into possession of the documents and materials from the marital home that she had unsuccessfully requested Mr. Bailey to produce in discovery, or had there been anything improper about the way in which the JGL Defendants electronically stored or transferred these documents, Mr. Bailey had every opportunity to request a protective order from the state judge.

What clinches the sham nature of the present suit is that the state court actually did consider Mr. Bailey's assertions of the need for protection of his alleged trade secrets and national security materials. When Mrs. Bailey and Mr. Friedman sought similar

materials in connection with the deposition of a bank official with respect to Mr. Bailey's corporate accounts, Mr. Bailey sought protection of trade secrets and national security concerns in his "Motion for Protective Order and to Quash Subpoena *Duces Tecum* to Protect Trade Secrets, Confidential Information and Proprietary Information." *See* Def.'s Mot. Protect. Order & Quash Subpoena, ECF No. 17-5. That Motion sought a broad protective order covering all trade secrets, proprietary information, privileged information, and financial information. *See id.* It should be remembered that, up to that point, Mr. Bailey had not only stonewalled information about his income, he had also refused to answer interrogatories or produce documents related to the companies he owned an interest in, including the corporate Plaintiffs here. Judge Asti denied Mr. Bailey's Motion for Protective Order and to Quash Subpoena[23] and eventually granted Mrs. Bailey's motion to compel Mr. Bailey to answer the interrogatories and produce documents, although—yet again—Mr. Bailey and his attorney sought no further order of protection from the state judge. *See* State Ct. Docket, ECF No. 30-1; State Ct. Disc. Order, ECF No. 34-9.

Equally important, Mrs. Bailey's divorce counsel, Mr. Friedman, had offered to execute a reasonable confidentiality order to protect trade secrets. While the parties went back and forth over the precise details of the protective order, Mr. Friedman

---

[23] The Court finds Mr. Chandler's argument that Judge Asti ruled only on the Motion to Quash, but not the Motion for Protective Order, is not only disingenuous but ultimately irrelevant. Mr. Bailey and his state court counsel, Mr. Nugent, could have and should have gone back to Judge Asti for clarification, and Mr. Chandler knew this full well. In addition, Mr. Chandler appeared to admit at the hearing at the Motion to Dismiss in this case that Mrs. Bailey and her counsel were entitled to the documents, stating "[t]here has never been an issue as to whether or not Mr. Friedman or Mrs. Bailey would have access to the material. The issue is copying . . . ." Mot. Dismiss Hr'g Tr. 33:15–17, ECF No. 20. This late-conceived statement clearly flies in the face of the extreme allegations Mr. Chandler pursued in the First Federal Case that Mrs. Bailey had "stolen" the materials and misappropriated trade secrets.

communicated to Mr. Bailey's counsel, Mr. Nugent, that the proposed order might serve as a basis for a future negotiated order. *See* Defs.' Suppl. Mot. Sanctions, Ex. 19, 20, 21, ECF Nos. 34-19, 34-20, 34-21.

But at the very same time the protective order was being discussed in the state proceedings, the highly-flawed First Federal Case was filed in this Court. Mr. Nugent's statements in the divorce proceedings further confirm that he had referred the issues of the protective order to Mr. Chandler, counsel for the corporate Plaintiffs in the present suit, who objected to Mr. Friedman's counterproposals even after the First Federal Case was dismissed. State Ct. Hr'g Tr. 35:16–36:13, 39:21–23, May 5, 2015, ECF No. 34-8.

The inescapable fact is that the copyright and trade secret claims in this suit were nothing more than a crafty attempt to pursue in parallel litigation in federal court an issue that was either already decided by the state court or which could have been or should have been for the state court to decide, namely access to and the use of purportedly sensitive materials relevant to the determination of marital assets in the divorce proceeding. In sum, despite the superficial federal question nature of this suit, the real purpose is plainly a domestic relations issue that belongs to the Maryland state court. It does not belong in federal court. *See Lovern v. Edwards*, 190 F.3d 648, 655 (4th Cir. 1999) ("[F]ederal courts must guard against the litigant who frames a pretextual federal issue solely for the purpose of having a state-law claim adjudicated in the federal system . . . ."); *Firestone v. Cleveland Trust Co.*, 654 F.2d 1212, 1215 (6th Cir. 1981) ("Even when brought under the guise of a federal question action, a suit whose substance is domestic relations generally will not be entertained in a federal court."); *see also McNeil v. Maryland*, No. DKC 11–2495, 2012 WL 3643899, at *7 (D. Md. Aug. 22, 2012) aff'd,

505 F. App'x 279 (4th Cir. 2013) (dismissing under *Rooker-Feldman* doctrine federal and

state claims seeking review of adverse state court domestic relations decisions, or matters

"inexplicably intertwined" with such decisions); *Al-Mansour v. Shraim*, No. CCB-11-

2939, 2012 WL 983785, at *4 (D. Md. Mar. 21, 2012).

For the foregoing reasons, the Court **DISMISSES WITH PREJUDICE**

Plaintiffs' claims for federal copyright infringement and misappropriation of trade secrets

under Maryland law. [24]

## IV.

The Court turns to the JGL Defendants' Motion for Sanctions.

## A.

Rule 11(b) of the Federal Rules of Civil Procedure provides that whenever a

pleading, written motion, or other paper is either signed by or advocated by an attorney,

---

[24] In the alternative, the Court would conclude that the suit must be dismissed for failure to state a claim. To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). This standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L.Ed. 2d 868 (2009). Although a court will accept factual allegations as true, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

To recover on their copyright claim, Plaintiffs would have to show that they owned a valid copyright and that the JGL Defendants encroached upon one of the exclusive rights it conferred, such as the control of reproduction, distribution, and performance or display of the original, as well as the production of derivative works. *See* 17 U.S.C. § 501(a); *Avtec Sys., Inc. v. Peiffer*, 21 F.3d 568, 571 (4th Cir. 1994) (citing 17 U.S.C. § 106).

The JGL Defendants contend that, even assuming *arguendo* Plaintiffs have plausibly alleged that they own a valid copyright, and that the JGL Defendants have infringed upon the exclusive control of reproduction and distribution of said copyright, the Complaint must be dismissed because a valid fair use defense, i.e. its use in litigation, appears on the face of the Complaint. The Court agrees. *See* 17 U.S.C. § 107; *Bond v. Blum*, 317 F.3d 385, 394 (4th Cir. 2003) (finding the defendants' use of plaintiff's entire copyrighted work for its evidentiary value in a child-custody proceeding fell within the scope of fair use under 17 U.S.C. § 107); *Denison v. Larkin*, 64 F. Supp. 3d 1127, 1133 (N.D. Ill. 2014) ("The House Committee on the Judiciary explicitly listed 'reproduction of a work in legislative or judicial proceedings or reports' as an example of a fair use.") (quoting H.R. Rep. No. 94-1476, 65 (1976)); *Stern v. Does*, 978 F. Supp. 2d 1031, 1047–48 (C.D. Cal. 2011) ("Reproduction of copyrighted material in litigation or potential litigation is generally fair use . . . .") (citing cases).

the attorney certifies that, to the best of his knowledge, information and belief, formed after an inquiry reasonable under the circumstances, the factual and legal contentions are warranted, and that "it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation."[25]  Fed. R. Civ. Pro. 11(b).

The reasonable inquiry requirement under Rule 11(b) mandates that, prior to filing the pleading, an attorney must conduct a reasonable investigation to determine three things: (1) whether the complaint was filed for an improper purpose, (2) the factual basis for the claims, and (3) the legal basis for the claims. *See In re Kuntsler*, 914 F.2d 505, 513 (4th Cir. 1990).

To determine whether the attorney signatory had an "improper purpose" in bringing the suit, the court applies an objective standard of reasonableness to the signatory's conduct. *See In re Weiss*, 111 F.3d 1159, 1171 (4th Cir. 1997) (citing *In Re Kunstler*, 914 F.2d 505, 518) (4th Cir. 1990).  The court considers objective evidence of the attorney's motive, including circumstantial facts related to the filing of the document, in assessing whether the purpose is improper. *See id.*

---

[25] The Court finds that the JGL Defendants have complied with Rule 11(c)(2) in that counsel for Defendants, Ms. Lake, sent counsel for Plaintiffs, Mr. Chandler, a letter on June 19, 2015 with a proposed Motion for Sanctions enclosed. *See* Defs.' Mot. Sanctions, Ex. 1, ECF No. 17-1. Mr. Chandler responded on July 11, 2015 with a letter rejecting Ms. Lake's request that Plaintiffs voluntary dismiss the Complaint. *See* Defs.' Mot. Sanctions, Ex. 2, ECF No. 17-2. Mr. Chandler's letter cc'd Mr. Bailey and Mr. Nugent. *Id.* Plaintiffs argue that the JGL Defendants failed to serve them with the "exact copy" of the Motion for Sanctions they filed on August 13, 2015. Pls.' Resp. Opp'n Mot. Sanctions at 10–11, ECF No. 23-1. However, the redline version of the Motion as filed on August 13, 2015 compared to the one sent on June 19, 2015 reveals only minor stylistic edits and one new sentence noting that Plaintiffs filed a Motion for Partial Summary Judgment. Defs.' Reply Mot. Sanctions, Ex. 2, ECF No. 25-2. Accordingly, the JGL Defendants served Plaintiffs with the Motion for Sanctions at least 21 days prior to filing it, as required by Rule 11(c)(2).

An "improper purpose" under Rule 11 includes factors "such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Fed. R. Civ. Pro. 11(b)(1). This list is not exhaustive. Courts have cited other factors such as the "filing of suit as leverage in separate proceedings, to obtain discovery for use in those other proceedings, and to embarrass, intimidate, or harass." *Myers v. Sessoms & Rogers, P.A.*, 781 F. Supp. 2d 264, 268 (E.D.N.C. 2011) (citing *In Re Kunstler*, 914 F.2d at 519). Circumstantial facts indicating an improper purpose include "[r]epeated filings, the outrageous nature of the claims made, or a signer's experience in a particular area of law, under which baseless claims have been made. . ." as well as "the timing of the filing of the complaint. . . ." *In re Kunstler*, 914 F.2d at 519.

The Court's analysis of the purpose of the present suit begins with the observation that the immediate effect of the suit was to force the withdrawal of Mr. Friedman and his firm JGL as counsel for Mrs. Bailey in the domestic relations proceedings. The suit, which challenged the right of the JGL Defendants to possess and copy documents obtained during those proceedings, put them in an impossible conflict of interest, as a direct result of which they were obligated to withdraw as Mrs. Bailey's counsel.

Mrs. Bailey thereby lost the benefit of the experience of counsel who had represented her from the beginning of her divorce proceedings, and was apparently forced to proceed *pro se* (the docket in the state case does not show the appearance by successive counsel). *See* State Ct. Docket, ECF No. 30-1. At the same time, Mr. Friedman, an accomplished domestic relations attorney, was not only forced to withdraw as Mrs. Bailey's attorney, he was caused to incur fees in defense of this suit, and may well have suffered a stain on his reputation by reason of the allegation in this suit that he

violated federal law. His firm has suffered an equivalent economic prejudice and potential tarnish. Mr. Friedman and JGL have had to refer this suit to their malpractice insurance carrier, which is providing their defense in the suit, and, as their malpractice counsel has advised the court, will henceforth always be required to report Plaintiffs' baseless claims on all manner of applications. *See* Mot. Sanctions Hr'g Tr. 28:18–30:3, Jan. 5 2016, ECF No. 38.

Who is responsible for these consequences?

To begin, it was Donald Bailey and Donald Bailey alone who was the sole beneficiary of Mr. Friedman's and JGL's withdrawal as Mrs. Bailey's counsel, leaving her unrepresented, and it was that fact that enabled Mr. Bailey, who undeniably controlled and de facto authorized the Second and the First Federal Cases, to gain significant "leverage in separate proceedings," another indicium of improper purpose under Rule 11(b). *See Myers*, 781 F. Supp. 2d at 268 (citing *In Re Kunstler*, 914 F.2d at 519).

Mr. Chandler, counsel for the corporate Plaintiffs here, was actively aware of and indeed involved to a considerate extent in the state divorce proceedings,[26] and thus had ample reason to know that his actions in the First and Second Federal Cases would create leverage for Mr. Bailey in the divorce proceedings. Mr. Bailey's wife lost her attorney, and Mr. Friedman got his comeuppance. But that is only the beginning of the sorry facts of this litigation.

---

[26] According to Mr. Chandler, the Board of Directors of the Plaintiff corporations provided Mr. Bailey with "loans" for legal fees in the divorce proceedings, including $60,000 in expenses paid to the JGL Defendants for the purposes of an expert evaluation of corporate assets. Mot. Sanctions Hr'g Tr. 48:22–49:2, 57:5–61:6, Jan. 5, 2016, ECF No. 38; s*ee* Pl.'s Opp'n Mot. Protect. Order at 2–3, ECF No. 17-6.

Other relevant factors bearing on whether this suit was initiated in bad faith require the Court to revisit facts already considered at length. Mr. Bailey's behavior showed gross inconsistency insofar as his asserted desire to protect trade secrets was concerned. When the Motion to Quash access to corporate bank records was denied by Judge Asti in the state court proceeding, Mr. Bailey did not follow up on Judge Asti's ruling to seek clarification as to whether the Judge had also denied the protective order, nor did he move for reconsideration, nor did he file for a separate protective order with Judge Asti. Nor indeed did Mr. Bailey or his divorce counsel, Mr. Nugent, respond to Mr. Friedman's proposed edits to a proposed protective order in November 2014, *see* Defs.' Suppl. Mot. Sanctions, Ex. 21, ("Nov. 2014 Emails"), ECF No. 34-21, waiting several months to do so, during which time the First Federal Case was filed and the Second Federal Case was on the verge of being filed, even though Mr. Nugent stated in an email to Mr. Friedman that he "passed along a copy to Aldmyr-Zegato's counsel [i.e. Mr. Chandler] to see if this suffices for them." *Id.* at 2; *see* Defs.' Suppl. Mot. Sanctions, Ex. 23, ("March 2015 Emails"), ECF No. 34-23.

Instead, a mere two weeks after Judge Asti denied Mr. Bailey's Motion for a Protective Order and to Quash Subpoena, Mr. Bailey's company Zegato LLC (not a Plaintiff here), filed the First Federal Case against Mrs. Bailey, Mr. Friedman, and his firm. *See In re Kunstler*, 914 F.2d at 519 (noting that the timing of filing a complaint may be an indicator of improper purpose). Then, within four months of dismissal of the essentially botched First Federal Case, the present suit was filed. The proximity in time between the at least apparent denial of protective relief by the state court judge and the

filing of the First Federal Case further suggests that the present federal litigation was meant to retaliate for the unsuccessful result in state court.

In the interim, after the First Federal Case was dismissed, Mr. Bailey never returned to state court to seek a protective order. *See* State Ct. Docket, ECF No. 30-1. Letters between Mr. Nugent and Mr. Friedman show that Mr. Nugent responded on March 20, 2015—four months after Mr. Friedman proposed an alternate draft in November 2014—with a counterproposal for the protective order with what he said "Zegato et al. find minimally acceptable." *See* March 2015 Emails, ECF No. 34-23. Although Mr. Nugent told Mr. Friedman in the email, "[i]f you are not able to accept this version, I have to direct you to The Chandler Law Firm," *id.* at 3, within two weeks of this exchange, Mr. Chandler, on behalf of the corporate Plaintiffs, filed the present federal suit.

Incredibly, the corporate Plaintiffs, supposedly concerned about the "national security" aspects of trade secrets and copyrighted material, have never filed a Motion to Seal in the present case.[27]   Prior to the filing of this suit and the First Federal Case, only the parties to the divorce proceedings, Mr. Chandler, the corporate Plaintiffs here, and Mr. Bailey, were aware that the JGL Defendants were in possession of supposedly sensitive corporate materials.   If Plaintiffs' alleged trade secrets were, in fact, so vulnerable to hackers as Plaintiffs' has counsel contended, their own actions in filing the Federal suits may only have increased that risk. Not only is this laxness inconsistent with the legitimate objective of protecting trade secrets, it is another reason leading the Court

---

[27] In the body of their Opposition to Motion for Sanctions, well at the end of this case, Plaintiffs for the first time requested that specific exhibits be sealed, but they have never filed a separate motion to that effect. *See* Pls.' Resp. Opp'n Defs.' Mot. Sanctions at 1, ECF No. 23.

to conclude that the primary purpose of both this case and the First Federal case was to gain leverage in the divorce proceedings.

The harassing nature of the suit is further evidenced by the frivolous nature of the claims. *See In Re Kunstler*, 914 F.2d at 519 (stating a court may infer an improper purpose from the willful filing of baseless claims). The idea that a spouse, by taking papers pertaining to her husband's business that are in her home and by sharing them with her attorney, risks violating federal copyright law or Maryland trade secret law—as the Court earlier stated—is nothing short of ridiculous. In the context of domestic relations proceedings, it is an entirely common practice for spouses—who invariably have unique access to each other's otherwise private information—to search for asset information and share that information with their attorneys, especially where the other spouse may have tried to conceal or shield that information.[28] The state court system is perfectly well-equipped to manage the discovery and evaluation of all potential marital property—including copyright, trademarks, and the like—and they are perfectly well-equipped to enter appropriate protective orders.

The harassing nature of this suit is further exemplified by Plaintiffs' continuous allegations that the JGL Defendants engaged in criminal activity. The First Federal Case attempted to bring civil claims against Mrs. Bailey and the JGL Defendants under 18 U.S.C. § 1832, which, in fact, criminalizes the misappropriation of trade secrets. Although Judge Chuang, in dismissing the case, aptly pointed out the inapplicable and frivolous nature of such claims, the scattered filings in the present case, for some

---

[28] Mr. Bailey, along the way, has asserted he was forced to leave the marital home by police, and thus did not abandon the documents in his home office. *See* Pls.' Resp. Opp'n Mot. Sanctions at 7, ECF No. 27. It is irrelevant how or why he left the home; his assets remained relevant and discoverable in the state divorce proceedings and were always protectable by an appropriately solicited protective order in state court.

inexplicable reason, continue to cite 18 U.S.C. § 1832, as well as other federal criminal statutes, as legal justifications for Plaintiffs' civil claims. *See, e.g.*, Compl. ¶ 32; Pls.' Resp. Opp'n Mot. Sanctions at 10, ECF No. 23-1; Pls.' Resp. Opp'n Mot. Sanctions at 9, ECF No. 27; Pls.' Resp. Opp'n Suppl. Mot. Sanctions at 7, ECF No. 35. Why are there such references in the present case? The Court can only conclude that the present Federal Case as well as the First Federal Case were intended to carry forward Mr. Bailey's state-based skirmishes with Mrs. Bailey, Mr. Friedman, and JGL to the new battlefield of federal court. Mr. Chandler's ineptitude in pleading the criminal statute as a civil claim against Mrs. Bailey, then continuing to allude to it in the Second Federal Case, not only suggests harassment, it clearly reflects the shallowness of his legal investigation in both the state and federal litigation.

While the Court's primary concern under Rule 11(b) has been with the improper purpose of this suit, its analysis also supports a finding that Plaintiffs' counsel, Mr. Chandler, failed to conduct a reasonable inquiry into the factual and legal background of the state divorce proceedings or, what is more likely the case and what is worse, that he knew full well what was going on in the state proceedings (e.g. he was actively commenting on the proposed protective orders being discussed and simply chose to disregard what he knew). *See* Fed. R. Civ. Pro. 11(b) ("[A]n attorney . . . certifies that . . . the claims, defenses, and other legal contentions are warranted by existing law . . . [and] the factual contentions have evidentiary support . . . ."); *see, e.g.*, *Morris v. Wachovia Sec., Inc.*, 448 F.3d 268, 277 (4th Cir. 2006). A court may sanction an attorney for taking a baseless legal position when, "applying a standard of objective reasonableness, it can be said that a reasonable attorney in like circumstances could not have believed his actions

to be legally justified." *Hunter v. Earthgrains Co. Bakery*, 281 F.3d 144, 153 (4th Cir. 2002) (quoting *In re Sargent*, 136 F.3d 349, 352 (4th Cir. 1998)) (quotation marks omitted).

Mr. Chandler apparently concedes that he understood that the state court had denied Donald Bailey's Motion to Quash, but argues that the state court did not rule on the Motion for a Protective Order. Mot. Dismiss Hr'g Tr. 13:8–14:18, Aug. 3, 2015, ECF No. 20. The Court emphatically does not agree. It may fairly be concluded that Judge Asti ruled on the entire motion, including the Motion for Protective Order. In fact, by implication, denial of the Motion to Quash by itself meant that Mrs. Bailey and her counsel were being granted access to any and all material the bank might possess, including the supposedly sensitive material, even without any protective order in place. Not surprisingly, at the hearings on Defendants' Motion to Dismiss and on Defendants' Motion for Sanctions, Mr. Chandler clearly ducked the Court's questions as to why he did not go back to the state court to obtain the desired protection.[29] The scope of

---

[29] The following is taken from the Motion to Dismiss hearing:

> The Court: Did you seek a protective order?
> Mr. Chandler: Yes
> The Court: In state court?
> Mr. Chandler: Yes. It was left open. No decision because Mr. Friedman and Mr. Nugent was to negotiate.
> The Court: Why didn't you go back to the state court judge?
> Mr. Chandler: No. Mr. Friedman said that I have to have—he has to have the right to decide—
> The Court: Why didn't you go back to the state court judge?
> Mr. Chandler: I wasn't involved in that.

Mot. Dismiss Hr'g Tr. 34: 13–24, Aug. 3, 2015, ECF No. 20.

The following is taken from the Motion for Sanctions hearing:

> The Court: Did you not know that [Mr. Nugent] sought protection of misappropriation -- he sought protection against the appropriation of trade secrets in this proposed order? . . .
> Mr. Chandler: No. What I understand, I did send Mr. Nugent a sample of a trade secret agreement which he could follow and decided what he wanted to do and whatever he did,

discovery in the state court proceedings had been already fairly identified. For Mr.

Chandler—who was, by the way, one of the three directors on Plaintiff Aldmyr's Board

of Directors (the other two being Mr. Bailey and his brother, Lamont Bailey, who

purportedly owns a 10% interest)—to follow up two weeks later with a suit in federal

court based on the JGL Defendants' possession and copying of the same documents,

demonstrates an unjustifiable lack of investigation, if not outright malice, on Mr.

Chandler's part.  This concerning behavior is emphasized by the fact that Mr. Nugent's

emails indicate that, while Mr. Friedman's proposed edits to the protective order were

passed on to Mr. Chandler for review in November 2014, *see* Nov. 2014 Emails, ECF

No. 34-21—a point which Mr. Chandler appeared to confirm at the hearing on the

Motion for Sanctions—Mot. Sanctions Hr'g Tr. 14:2–14, Jan. 5, 2016, ECF No. 38,[30] Mr.

Chandler did not respond to that submission until after he had filed the First Federal Case

and just before filing the present suit. *See* March 2015 Emails, ECF No. 34-23.[31]

---

he did. But at the end of the day, he informed me that Mr. Friedman refused to agree to
the protective order and he wanted me to do something. I've forgotten what the letter said.
The Court: Did he maybe say to you maybe we should go back to the court and see if we
can overrule Mr. Friedman?
Mr. Chandler: No, no, no.
The Court: He didn't say that?
Mr. Chandler: No, no.
The Court: Did you suggest to him why don't you go back to court and see whether you
can get the court to order it, even though Mr. Friedman opposes it? Did you tell him that?
Mr. Chandler: No.
The Court: Why is that?
Mr. Chandler: I chose this forum.
Mot. Sanctions, Hr'g Tr. 63:11–64:4, Jan. 5, 2016, ECF No. 38.

[30] Mr. Chandler stated at the hearing on the Motion for Sanctions, "Mr. Nugent filed—sent me a
letter from Mr. Friedman which said get Mr. Chandler to agree to something and it related to
trade secrets. But by that time the harm had already been done."  Mot. Sanctions Hr'g Tr. 14:7–
10, Jan. 5, 2016, ECF No. 38.
[31] Mr. Nugent's March 20, 2015 email states that he attached a mark-up that is "what Zegato et al.
find minimally acceptable . . . If you are not able to accept this version, I have to direct you to
The Chandler Law Firm for further discussions." March 2015 Emails at 3, ECF No. 34-23. Mr.

Ultimately, the Court can only express astonishment at Mr. Chandler's profound lack of appreciation of the significance of the domestic relations proceeding—which would necessarily involve consideration of assets owned, directly or indirectly, by Mr. Bailey, *including* assets related to copyright or trade secrets, or that the state court would be the proper court to order production of those assets and, if appropriate, that it could do so with a protective order. The facts of the Complaint drafted by Mr. Chandler were, as stated multiple time already, nothing more than the veiled rehashing of a discovery dispute that had taken and was still taking place within the context of the divorce proceedings. The smoking gun, if there is one, is that the Complaint in this case even states that "counsel to Plaintiffs advised the marriage counsel to seek a protective order to protect the intellectual property from disclosure . . . ." Compl. ¶ 23. That is, Mr. Chandler told Mr. Nugent to obtain a protective order, yet he never suggested that Mr. Nugent go back for clarification of the earlier order denying the Motion for Protective Order and to Quash Subpoena or to seek further protection in state court before filing this federal suit. *See e.g.*, Mot. Sanctions Hr'g Tr. 17:24–18:25, Jan. 5, 2016, ECF No. 38. So even if Mr. Chandler was truly ignorant about certain aspects of the state divorce proceedings, his lack of diligence in investigating his claims and the interrelationship of the state and federal proceedings was patently unreasonable.

Not only do all these reasons support the dismissal of this suit, they fully support a finding that this suit was filed by Mr. Chandler and the two corporate Plaintiffs, in violation of the Federal Rule of Civil Procedure 11(b).

---

Friedman's March 22, 2015 letter in response notes that "[i]t took 4 months to get a response to my proposed Protective Order. . . .I understand that you are not the cause of the delay. This is obviously your client's game plan. . . ." *Id.* at 1.

**B.**

Again, Rule 11(b) provides that whenever a pleading is signed by or advocated by an attorney, he certifies that, to the best of his knowledge, formed after a reasonable inquiry, the factual and legal contentions are warranted, and that "it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Fed. R. Civ. Pro. 11(b).

Having found a violation of Rule 11(b) by Mr. Chandler and the corporate Plaintiffs, the Court considers what sanctions, if any, should be imposed upon them and whether those sanctions should extend to Mr. Bailey. If a court "determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation."[32] Fed. R. Civ. P. 11(c)(1). Rule 11, then, applies not only to counsel but also to parties, represented or unrepresented. *Wassel v. Samuel*, No. 93-2635, 1995 WL 5772, at *2 (4th Cir. 1995) (citing *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 551, 111 S. Ct. 922, 934-35, 112 L. Ed. 2d 1140 (1991)); *see also Cleveland Demolition Co. v. Azcon Scrap Corp.*, 827 F.2d 984, 986 (4th Cir. 1987) (imposing sanctions against Plaintiff and counsel).

The Court finds that sanctions as to Plaintiffs' counsel Mr. Chandler and the corporate Plaintiffs are unquestionably appropriate. *See Byrd v. Hopson*, 108 F. App'x 749, 756 (4th Cir. 2004) (sanctioning both attorney and client for suit brought with improper purpose of harassment).

---

[32] Rule 11(c)(1) further states that, "[a]bsent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee."

But who, really, are the corporate Plaintiffs?  They are none other than Donald Bailey.  As CEO and controlling shareholder of the Plaintiff corporations—who at various times has characterized himself as the 100% owner of the corporate Plaintiffs, and other times less than 100%, but at all times indisputably the controlling individual of the corporations—he must be held personally liable, jointly and severally, with his corporations and Mr. Chandler.  It was Mr. Bailey and he alone who was the principal beneficiary of this litigation.

In response to the Court's show cause order, Mr. Chandler contended that the Court lacked jurisdiction over Mr. Bailey as an individual, so that imposing sanctions upon him would violate his right to due process.  Pls.' Resp. Opp'n Mot. Sanctions at 1–2, ECF No. 27.  Mr. Chandler argued to this effect even while Mr. Bailey chose not appear at the Show Cause Hearing in person or through counsel of his own to vindicate his rights.  (Mr. Chandler, interestingly, was quite vigorous in arguing the cause of someone he called "not my client.")  Mot. Sanctions Hr'g Tr. 2:12–3:10, Jan. 5, 2016, ECF No. 38; *see* Pls.' Resp. Opp'n Suppl. Mot. Sanctions at 2–3, ECF No. 35.

The Court finds that Mr. Bailey was given the full measure of due process, which he declined to avail himself of, such that the Court is prepared to adjudicate the issue of Rule 11 sanctions against him.

Federal courts have consistently found that they may exercise personal jurisdiction over an individual, without raising due process concerns, where the individual is the alter ego of a corporation that is party to a suit.  *See Newport News Holdings Corp. v. Virtual City Vision, Inc.*, 650 F.3d 423, 433 (4th Cir. 2011) (citing *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 653 n.18 (5th Cir. 2002)).

While the corporate form generally prevents liability from being imposed on an individual, where a corporate entity controlled by an individual is involved in litigation, a court may "pierce the corporate veil in 'extraordinary circumstances,' such as when the corporate form is being used for wrongful purposes," and may exercise jurisdiction over the individual. *Flame S.A. v. Freight Bulk Pte. Ltd.*, 807 F.3d 572, 587 (4th Cir. 2015) (citing *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 543–44 (4th Cir. 2013). While a district court must exercise caution in this regard, after a careful review of the facts and circumstances of the particular case, "courts will not hesitate to take such action when justice so requires." *Keffer v. H.K. Porter Co.*, 872 F.2d 60, 64 (4th Cir. 1989).

To determine whether an entity is the alter ego of an individual, courts consider such factors as "gross undercapitalization, insolvency, siphoning of funds, failure to observe corporate formalities and maintain proper corporate records, non-functioning of officers, control by a dominant stockholder, and injustice or fundamental unfairness." *Ost–West–Handel Bruno Bischoff GMBH v. Project Asia Line, Inc.*, 160 F.3d 170, 174 (4th Cir. 1998) (citing *Keffer*, 872 F.2d at 65; *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 684–87 (4th Cir. 1976)). These factors do not create a "firm rule." *Vitol*, 708 F.3d at 544. Instead, corporate veil piercing is used to achieve an equitable result by focusing on "reality and not form, [on] how the corporation operated and the individual defendant's relationship to that operation." *Ost–West–Handel*, 160 F.3d at 174 (quoting *DeWitt*, 540 F.2d at 685) (quotation marks omitted).[33]

---

[33] The Court notes that "[t]he Fourth Circuit applies federal standards to a veil-piercing claim under other federal statutes because 'veil[ piercing] determines who is liable' under the statute[.]" *Mayes v. Moore*, 419 F. Supp. 2d 775, 782 n.5 (M.D.N.C. 2006) (quoting *Thomas v. Peacock*, 39 F.3d 493, 502–03 (4th Cir. 1994), *rev'd on other grounds*, 516 U.S. 349, 116 S. Ct. 862, 133 L.Ed.2d 817 (1996)). Nevertheless, Maryland law would yield the same outcome. While Maryland law applies the doctrine "only when necessary to prevent fraud or to enforce a

The reality of corporate Plaintiffs' operations here demonstrates that Plaintiffs Aldmyr and Zegato, Inc. are no more than nominal parties in this suit. While they may or may not be the nominal owners of the copyright in question, which Mr. Bailey copyrighted and assigned to them for unknown consideration, they were and are wholly or substantially owned and, in any case, wholly controlled by Mr. Bailey.

According to Plaintiffs' Response to the Show Cause Order, Aldmyr's three-person Board of Directors—Mr. Bailey, his brother Lamont Bailey, and Plaintiffs' counsel, Mr. Chandler—all voted in favor of this suit, with Mr. Bailey purportedly abstaining at first, then "chang[ing] his vote after the vote was taken." Pls.' Resp. Opp'n Mot. Sanctions at 7, ECF No. 27; *see* Pls.' Resp. Opp'n Mot. Sanctions, Ex. 1, Aldmyr Board of Directors Minutes, ECF No. 27-1; Pls.' Resp. Opp'n Suppl. Mot. Sanctions at 6–7, ECF No. 35. Still, Mr. Bailey has not clearly addressed who authorized the suit on behalf of Zegato Inc. Since Mr. Bailey did not appear at the show cause hearing to respond to these assertions under penalties of perjury, Mr. Chandler, as has been his way throughout most of these proceedings, simply asserted this to be a fact in the course of his arguments to the Court.

The record evidence, however, overwhelmingly supports the conclusion that Mr. Bailey's de facto control over the Plaintiff corporations led to the filing of the Second and the First Federal Cases. [34] While it appears that Mr. Bailey may not currently hold a

---

paramount equity," *Hildreth v. Tidewater Equip. Co.*, 378 Md. 724, 735, 838 A.2d 1204, 1210 (Md. 2003), the Court finds that "exceptional circumstances" requiring the enforcement of a paramount equity are present in this case. *See id.* (citing 1 William Meade Fletcher, et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 41.30, 583–86 (perm. ed., rev. vol. 1999)).

[34] The Court does not find Lamont Bailey's stated concerns about his corporate shares "co-mingling" with Geraldine Bailey's marital property in the least bit relevant. *See* Pls.' Resp. Opp'n Mot. Sanctions, Ex. 3, Lamont Bailey Aff. ¶ 6, ECF No. 24-3; Pls.' Resp. Opp'n Suppl.

100% ownership interest in Aldmyr and Zegato, Inc.,[35] it is noteworthy that Mr. Bailey has at various times changed his testimony about whether he had a 100% interest.   In sworn testimony in the divorce proceeding, under questioning by his own attorney, Mr. Bailey stated that he was the CEO and held a 100% ownership interest in all of these entities.   State Ct. Hr'g Tr. 140:16–144:18, Dec. 18, 2014, ECF No. 13-1.   In attempting to correct this alleged "misstatement" during oral argument in August 2015, Mr. Chandler, again giving his own opinion offering no evidence, explained that Mr. Bailey "didn't know that it's more correct to say he has [one] hundred percent control rather than [one] hundred percent interest."   Mot. to Dismiss Hr'g Tr. 7:20–22, Aug. 3, 2015, ECF No. 20.   Mr. Chandler then explicitly conceded on the record, that with 100% control, Mr. Bailey had authorized the instant lawsuit.   *Id.* 7:23–25.

Among other factors the Court considers in deciding whether to pierce the corporate veil is whether Mr. Bailey's corporations have failed to observe corporate formalities and keep corporate records.   *See Keffer*, 872 F.2d at 65; *DeWitt*, 540 F.2d at 686–87.   As became apparent in the divorce proceedings, Plaintiffs Aldmyr and Zegato, Inc., as well as Mr. Bailey's other corporations, did not prepare or file tax returns at a minimum from 2009–2014.   *See* Def.'s Obj. & Suppl. Resp. Pl.'s 1st Req. Produc. Docs., Resp. No. 2, ECF No. 34-13; Def.'s Opp'n Pl.'s 2d Mot. Compel Disc. ¶¶ 3–4, ECF No.

---

Mot. Sanctions at 7, ECF No. 35.   Donald Bailey's divorce proceedings will have no impact on his brother Lamont's alleged 10% ownership of shares in Aldmyr.

[35] According to pleadings Donald Bailey filed in the divorce proceeding and attached to Plaintiffs' surreply, he has a 90% ownership interest in Aldmyr.   Def.'s Opp'n Pl.'s Mot. Adjudicate Def. Contempt of Court at 4, ECF No. 11-31.   Mr. Bailey represented in the divorce proceeding that he has a 50% ownership interest in Zegato, Inc. and a 100% ownership interest in Zegato LLC (party in First Federal Case only).   *Id.*   At other points in the divorce proceeding, Mr. Bailey represented that he had a 100% in Zegato, Inc.   *See* State Ct. Hr'g Tr. 142:23–144:18, Dec. 18, 2014, ECF No. 13-1.   The most plausible explanation for this discrepancy regarding the ownership of Zegato, Inc. is that Aldmyr or some combination of Mr. Bailey's companies own the other 50% interest in Zegato, Inc.

34-14. Mr. Bailey stated in his Opposition to Mrs. Bailey's Second Motion to Compel

Discovery that he hired a certified public accountant for the "laborious task of reviewing

corporate and personal records to create Federal and State tax returns." Def.'s Opp. Pl.'s

2d Mot. Compel Disc. ¶ 4. In addition, Mr. Bailey testified in the divorce proceedings

that the companies did not keep a general ledger, had not maintained a balance sheet "for

the last couple of years," and did not maintain profit and loss statements. State Ct. Hr'g

Tr. 113:19–114:6, Dec. 18, 2014, ECF No. 13-1. All these facts, of course, testify to Mr.

Bailey's alter ego status with the corporate Plaintiffs.[36]

There is no question that, at all times, Mr. Bailey has known the status of his state

divorce proceedings and, in particular, that on behalf of himself and the corporate

Plaintiffs here, he sought—unsuccessfully as it happens—to obtain a protective order

with respect to his purported copyright and trade secrets in state court. Furthermore, Mr.

Bailey is the clear beneficiary of this suit, depriving as it necessarily did, his wife of

counsel in the divorce proceeding, and almost assuredly allowing him to get back at Mr.

Friedman and JGL by forcing them out of the state proceedings, causing them to incur

thousands of dollars in fees in defending this suit, and sullying their reputation into the

bargain.

The Court thus concludes that Donald Bailey was, at all relevant times, the alter

ego of the two corporate Plaintiffs here, and that he was the true party in interest

responsible for initiating this suit to benefit himself in the state divorce proceeding.

Since the "corporate form is being used for wrongful purposes," *Flame S.A.*, 807 F.3d at

---

[36] Then, too, according to Mr. Chandler, the Plaintiff corporations provided Mr. Bailey with "loans" for legal fees in the divorce proceedings, including $60,000 in expenses paid to the JGL Defendants for the purposes of an expert evaluation of corporate assets. Mot. Sanctions Hr'g Tr. 48:22–49:2, 57:5–61:6, Jan. 5, 2016, ECF No. 38; *see* Pl.'s Opp'n Mot. Protect. Order at 2–3, ECF No. 17-6.

587, the Court pierces the corporate veil in this case in order to achieve an equitable result.

The Court finds Donald Bailey, as an individual, jointly and severally liable for sanctions, along with the corporate Plaintiffs and Mr. Chandler.

## C.

Rule 11 provides that any sanction imposed "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4); *see also Hunter*, 281 F.3d at 151 ("Under Rule 11, the primary purpose of sanctions against counsel is not to compensate the prevailing party, but to deter future litigation abuse.") (citations omitted). Rule 11(c)(4) contains a list of potential sanctions, indicating that, if "warranted for effective deterrence," the court may impose "an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." Fed. R. Civ. P. 11(c)(4); *see Williams v. Prince George's Cnty. Hosp. Ctr.*, 932 F. Supp. 687, 690–91 (D. Md. 1996) (awarding attorney's fees).

In making a determination of the amount of a monetary sanction, the court considers: "(1) the reasonableness of the opposing party's attorney's fees; (2) the minimum to deter; (3) the ability to pay; and (4) factors related to the severity of the Rule 11 violation." *In re Kunstler*, 914 F.2d at 523 (citing *White v. General Motors Corp.*, 908 F.2d 675 (10th Cir. 1990)).

The Court concludes that JGL Defendants' total costs and fees, $22,834.40, are reasonable under the traditional lodestar method of calculation, *see In re Kunstler*, 914 F.2d at 523 (citing *White*, 908 F.2d at 684), defined as the "reasonable hourly rate

multiplied by hours reasonably expended." *Grissom v. Mills Corp.*, 549 F.3d 313, 320 (4th Cir. 2008). An hourly rate is reasonable if it is in line with "'prevailing market rates in the relevant community' for the type of work for which [the attorney] seeks an award." *Spell v. McDaniel*, 824 F.2d 1380, 1402 (4th Cir. 1987) (quoting *Blum v. Stenson*, 465 U.S. 886, 895–96 & n.11 104 S. Ct. 1541, 1547 & n.11, 79 L.Ed.2d 891 (1984)). Appendix B to this Court's Local Rules establishes rates that are deemed reasonable for lodestar calculations. *See Poole ex rel. Elliott v. Textron, Inc.*, 192 F.R.D. 494, 509 (D. Md. 2000).

The JGL Defendants have requested costs and fees in the amount of $22,834.40 for 165.3 hours of work performed by counsel of record, Shirlie Lake, Esquire, of Eccleston and Wolf, P.C. and two of her associates.[37] *See* Defs.' Suppl. Mot. Sanctions at 12, ECF No. 34; Defs.' Suppl. Mot. Sanctions, Ex. 25, Lake Aff. ¶ 12, ECF No. 34-25.

Ms. Lake, a principal at her law firm, has almost 35 years of litigation experience in Maryland. Lake Aff. ¶¶ 3, 7, ECF No. 34-25. Per Appendix B to the Local Rules, a reasonable rate for an attorney who has been admitted to the bar for 20 years or more is $300–$475. Ms. Lake's hourly rate for this case at $150, *id.* ¶ 6, is well below the presumptively reasonable range in Maryland. Likewise, the hourly rate of her two associates, Daniel Hodges and Emily Patterson, is reasonable at $125. *Id.* Although their experience is not specified, reasonable rates under Appendix B start at $150 for attorneys admitted to the bar for less than five years.

For a court to assess whether hours were reasonably expended, the attorneys seeking the award must provide sufficient evidence of how their time was spent. Counsel

---

[37] The JGL Defendants initially requested fees for work performed by their own attorneys in defending the case but eventually withdrew the request. *See* Defs.' Suppl. Mot. Sanctions at 1, ECF No. 34.

are expected to provide all documentation necessary for the court to make a lodestar determination as to the hours reasonably expended, including but not limited to declarations establishing the hours expended by counsel, broken down for each task performed. *Saman v. LBDP, Inc.*, DKC-12-1083, 2013 WL 2949047, at *7 (D. Md. June 13, 2013); Local Rule 109.2; Appendix B to the Local Rules.

The JGL Defendants have submitted affidavits from Ms. Lake, as well as detailed billing statements that break down hours worked by each attorney in one-tenth of an hour units. *See* Defs.' Mot. Sanctions, Ex. 11, Aff. Fees & Expenses, ECF No. 17-12; Defs.' Suppl. Mot. Sanctions, Ex. 1, Lake Aff., ECF No. 28-1; Defs.' Suppl. Mot. Sanctions, Ex. 25, Lake Aff., ECF No. 34-25. Ms. Lake attests and the billing statements show that Eccleston and Wolf attorneys worked a total of 165.3 hours, of which 110.9 were expended prior to the Motion for Sanctions, amounting to $14,962.50 in fees and costs. *See* Aff. Fees & Expenses, ECF No. 17-12; Lake Aff. ¶ 10, ECF No. 34-25. In relation to the Motion for Sanctions, Ms. Lake and her two associates expended an additional 54.4 hours, for a total of $7,677.90 in costs and fees. *See id.* Lake Aff. ¶¶ 10–11, ECF No. 34-25.

The Court finds 165.3 hours to be a reasonable period of time for defense counsel to have spent on this case, including reviewing the Complaint, drafting a Motion to Dismiss, responding to Plaintiffs' improper Motion for Partial Summary Judgment, preparing for hearings, and pursuing sanctions against Plaintiffs, including several Supplemental filings—particularly in light of the complexities of copyright and trade secret law and potential jurisdictional implications of the pending domestic relations

proceedings.  The Court has no difficulty approving the fees accrued by Ms. Lake and her associates in the amount of $22,834.40.[38]

The Court further concludes that fees and costs of this magnitude are appropriate as the minimum sanction necessary to deter the corporate Plaintiffs, Mr. Bailey, Mr. Chandler, and others who might be inclined to follow their example from engaging in similarly abusive tactics in the future.

Suits such as the present one could wreak absolute havoc on domestic relations proceedings in Maryland—or, for that matter, in any state court in the country.  Spouses in state divorce proceedings, as well as their attorneys, should not have to run the risk of defending federal law suits as they gain access to a spouse's financial information, corporate documents, or other potential "trade secrets" while searching for marital assets. A suit such as this would put a premium on one spouse hiding or concealing certain documents, then refusing to make them available after routine discovery requests, then losing requests for protective relief in state court, and then circumventing the decision of the state court by filing a suit in federal court on a matter within the purview of the state court.  Suits such as the one initiated here would occasion delay, would needlessly raise costs to parties, and would do great injustice to the party coming into the possession of the documents, as well as that party's counsel.

Litigants and the attorneys who represent them in domestic relations proceedings in Maryland or elsewhere need to know that tactics of the sort deployed here—where the

---

[38] While the total amount of costs and fees from Eccleston and Wolf's 165.3 expended hours amounts to $22,640.40, the JGL defendants requested $22,834.40, which includes an additional $194.00 in costs for a transcript from the August 3, 2015 hearing. Lake Aff. ¶¶ 15, 17, ECF No. 34-25.

intent to harass, delay, and gain unfair advantage is clear—will be appropriately sanctioned.

Donald Bailey, Attorney Chandler, and the Plaintiff shell corporations may have believed they were gaining some sort of advantage against Mrs. Bailey and her counsel in the Anne Arundel County divorce proceedings, but they must now be brought to book for engaging in these unfair tactics.

The Court finds that the corporate Plaintiffs, Mr. Bailey as the alter ego of the corporations, and Attorney Chandler have violated Rule 11(b) of the Federal Rules of Civil Procedure.

The Court will enter a judgment in favor of the JGL Defendants and against the corporate Plaintiffs, Mr. Bailey, and Attorney Chandler, jointly and severally, in the amount of $22,834.40.

A separate Order will **ISSUE.**

/s/
_____
**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

**March 18, 2016**